UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
BARBARA MOLNAR,

Plaintiff,

Case No.

-against-

**COMPLAINT**
Plaintiff demands trial by jury for
all claims so triable.

VOX MEDIA, LLC and BINDU BANSINATH,

Defendants.
-----------------------------------------------------------x

Plaintiff BARBARA MOLNAR, by her attorneys, Law Office of Richard A. Altman, for her

complaint against defendants, alleges as follows:

<u>**INTRODUCTION**</u>

1. This is an action for defamation and malicious falsehood, based upon an article of and

concerning the Plaintiff Barbara Molnar, published in *New York* magazine, owned by defendant Vox

Media, LLC, and written by defendant Bindu Bansinath ("the Article)."

2. The Article is replete with false and malicious statements of fact about the Plaintiff.

3. The statements were made with both constitutional and common-law malice, in that

Plaintiff had repeatedly informed Defendants of the falsity of the statements, and provided

documentary and other evidence to demonstrate their falsity.

4. The statements are false, and have exposed Plaintiff to widespread ridicule and contempt,

to the substantial damage of her previously excellent reputation, and to her physical and mental

health. Many of the statements in the Article were published with both constitutional and common-

law malice.

5. The Article has received widespread publicity and has been optioned for a television

miniseries starring Julia Louis-Dreyfus and Cecily Strong:

-1-

https://variety.com/2026/tv/news/julia-louis-dreyfus-cecily-strong-apple-series-1236672999/ ("the show...is inspired by a New York Magazine article").

6.  This miniseries will only further damage the Plaintiff's reputation by transferring the lies in the Article to a new medium. Plaintiff brings this action to counter those lies and to seek compensation for the damage caused by those lies.

## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), in that it is between citizens of different States, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.  Plaintiff is a resident and citizen of the State of Vermont.

9.  Defendants are residents and citizens of the State of New York and the City of New York respectively.

10.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district, in that the Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

11.  Plaintiff Barbara Molnar is an individual who, at time of bringing this action, resides and is domiciled in the State of Vermont. She is a professional nanny and private chef.

12.  Upon information and belief, defendant Vox Media, LLC ("Vox Media") is a limited liability company formed under the laws of Delaware, with its principal place of business at 1201 Connecticut Avenue NW, Suite 1100, Washington, D.C. 20036.

13.  On information and belief, Vox Media is authorized to do business in the State of New York and regularly transacts business within New York County, including the publication and

distribution of The Cut and the article at issue in this action. It maintains an office at 85 Broad Street, New York, NY 10004.

14. Upon information and belief, Defendant Bindu Bansinath is an individual who resides in the City and State of New York.

15. Defendant Bansinath is a writer and reporter for The Cut, a publication of Vox Media, and she authored the article, entitled "The Nanny Squatter" which is the subject of this action.

16. This Court has jurisdiction over Plaintiff's claims for defamation *per se*, defamation *per quod*, and defamation by implication under New York law, as the alleged defamatory statements were published by Defendants in this State, and the Defendants conduct business in this State within the meaning of New York CPLR 302.

## STATEMENT OF THE FACTS

17. On or about October 29, 2025, Defendant Vox Media published an article in a section of *New York* magazine entitled The Cut. The article was titled "The Nanny Squatter," and was authored by Defendant Bansinath ("the Article"). A true and complete copy of the Article is annexed as Exhibit A.

18. The subject of the Article was a relationship between Plaintiff and a married couple named Jamie Carano Nordenström and Philip Nordenström. They are referred to herein collectively as "the Employer," although Plaintiff dealt almost exclusively with Jamie Nordenström.

19. The opening paragraph of the Article reads as follows:

Manhattanites with money come to Hillsdale, a town of 1,800 about 20 minutes east of Hudson, when they want to slow down. About ten years ago, Jamie Carano Nordenström and her husband, Philip Nordenström, two consultants in their late 30s, bought and restored a neo-Colonial farmhouse there; it was meant to be a weekend home, but they liked the peace and quiet so much that they eventually moved in full time. In the summer of 2024, Jamie gave birth to their daughter. The couple wanted their baby to be raised "at least" bilingual — Philip is Swedish — but they struggled

-3-

to find au pairs willing to come to Hillsdale. They settled for a nanny. "Guest house is provided," the couple's ad on the website Nanny Lane read. "Candidate could spend partial weekends upstate."

20. Plaintiff responded to the ad, and the couple interviewed and then hired her.

21. The Article's title, "The Nanny Squatter," and its content affirmatively stated and implied that Plaintiff was an illegal trespasser, that she had refused to leave the premises of her former Employer, despite that Plaintiff had already moved out before speaking to Defendant Bansinath.

22. Plaintiff had provided Defendant Bansinath with recordings, text messages, and court documents demonstrating that she actively sought new housing and employment and prioritized her son's education, and that she had never refused to leave.

23. Defendants published the Article with the "Nanny Squatter" title and the claim that Plaintiff refused to leave, despite having received and reviewed Plaintiff's evidence to the contrary.

24. In fact, the Defendants initially led Plaintiff to believe that they wanted to write an article about her rebuilding her life after being a victim of bank fraud, a case which was investigated by the FBI.

25. But it turned out that this was a pretext, and that Defendants' real interest was to publish a story about a wealthy couple's life in rural New York State.

26. The Article that resulted is replete with examples of knowing falsity.

27. For example, the Article stated that Plaintiff was hired for 18 hours per week at $25 per hour, and that she expanded her hours without permission.

28. But Plaintiff's posted rate on Nanny Lane was $30 per hour, and she promptly informed her Employer of this rate after receiving the first payment.

29. Plaintiff's hours increased to full-time at the Employer's request, as shown by schedules and Venmo payments, with specific expansions in November 2024 and January 2025.

30. Plaintiff had provided Defendant Bansinath with text messages and payment records demonstrating that her hours were expanded by the Employer and that she became a full-time employee soon after hire.

31. The Article falsely suggested that Plaintiff had sought free housing as charity.

32. But Plaintiff and her Employer had negotiated that housing would be provided as part of her compensation, with a reduced hourly cash rate, so that her son could remain in local school.

33. Plaintiff had provided Defendant Bansinath with the original job posting and communications, showing that housing was included in the employment arrangement.

34. The Article stated or implied that Plaintiff deceived her Employer about her son and dog living on the premises.

35. But Plaintiff's Employer knew about and approved Plaintiff's son moving in, had asked about pets before the move, and had furnished the cottage for both her son and dog.

36. Plaintiff provided Defendant Bansinath with text messages and other evidence showing her Employer's knowledge and approval of her son and dog residing with her.

37. The Article falsely said that Plaintiff failed to clean up after herself or her dog, trespassed on neighbors' property, and introduced herself deceptively as a neighbor.

38. But Plaintiff denied leaving messes or failing to clean up after herself or her dog.

39. Plaintiff had obtained explicit permission from neighbors to walk on their property, and followed routes shown to her by her Employer's spouse.

40. Plaintiff described herself as a neighbor in social contexts because she lived on the property, and her Employer never introduced her as a nanny in social settings.

41. The Article described an incident as an unauthorized "teenage pool party" while Plaintiff was absent, and alleged that teenagers had used the sauna without permission, and that Plaintiff became angry and banged pots.

42. But Plaintiff told Defendant Bansinath that her Employer had suggested a year-end pool gathering, that six known classmates visited briefly, and that she (the Employer) was present throughout.

43. The Article falsely stated that Plaintiff's Employer offered to pay her through the end of the month and help with rent at a new apartment, but that Plaintiff threatened to stay through October and invoked her rights as a tenant.

44. But Plaintiff never received a concrete offer of financial help for relocation. She provided to Defendant Bansinath recordings showing her Employer did not specify any assistance and instead asked Plaintiff to report about her job and housing search.

45. Plaintiff was a legal tenant, paid rent through her compensation structure, and consulted counsel and the local Town Clerk, who confirmed her tenant status.

46. Plaintiff lacked a key to her cottage door and installed interior cameras for safety.

47. The Article described an incident on June 25, 2025, in which Plaintiff allegedly accelerated her car toward her Employer when served with a ten-day notice to vacate, plainly an illegal threat to inflict serious bodily harm.

48. But Plaintiff denied to Defendant Bansinath that she had done so, stating that her Employer ran into her path while yelling, and that her son had recorded the encounter.

49. After the ten-day notice period, Plaintiff's Employer installed cameras aimed at Plaintiff's cottage and car.

50. The Article falsely said that Plaintiff's dog harassed the family and endangered their baby.

51. Plaintiff denied these allegations, stating that her dog regularly walked with parental approval and that the homeowners themselves walked her dog on multiple occasions.

52. The Article stated that an eviction petition which was brought described Plaintiff as a "professional con-artist" with a history of bad-faith occupancy.

53. Plaintiff denied being a con-artist, having a criminal record, or any history of unlawful conduct.

54. Plaintiff provided Defendant Bansinath with documentation of her non-existent criminal record, as well as FBI documents identifying her and her son as victims of identity and bank fraud.

55. The Article described a July 4 event, in which a guest entered Plaintiff's cottage bathroom, triggering her son's camera alert, and police responded.

56. Plaintiff texted her Employer that she was recording entries into "my house," and this exchange was accurately reported.

57. The Article falsely alleged the existence of inspection-based complaints such as odors, fried meat, wet dog blankets, lighting objects on fire, and theft of items.

58. Plaintiff had denied these allegations.

59. Plaintiff provided Defendant Bansinath with text messages, photos, and Fire Department reports refuting the inspection-based complaints and theft allegations.

60. The Article described Plaintiff and her son as "milling around town," and attributed erratic behavior to Plaintiff.

61. Plaintiff denied this portrayal, stating that neither Defendant Bansinath nor her Employer knew how she spent her days, and that the "milling around" description was invented and demeaning.

62. Plaintiff told Defendant Bansinath that an Assistant District Attorney had advised her to text "STOP HARASSING ME" to her Employer, and Plaintiff recorded that advice.

63. The Article recounted supposed facts from landlords regarding Plaintiff's residencies in Chatham, NY and Ghent, VT, falsely alleging that Plaintiff had bounced checks, arrears, eviction, and property damage.

64. Plaintiff denied these accounts to Defendant Bansinath.

65. Plaintiff denied making statements attributed to her such as "I'll do anything to keep a roof over our heads," and allegations of vandalism

66. Plaintiff provided Defendant Bansinath with documentation and recordings refuting the landlord allegations and showing her status as a victim of fraud.

67. In fact, the Vermont Human Rights Commission sued Plaintiff's former landlord, Robert Goldenhill, for renting an apartment that contained serious multiple health and safety violations.

68. The Article described Plaintiff as having a dangerous history and implied she was mentally unstable.

69. Plaintiff denied having a criminal record or any such mental health diagnosis, and provided Defendant Bansinath with FBI documentation and other evidence.

70. Plaintiff told Defendant Bansinath that her Employer had left a baby unattended in the kitchen during the inspection, and that her son had recorded the incident.

71. Plaintiff stated to Defendant Bansinath that she had moved out on August 31, 2025, earlier than the court's September 10 deadline, and disputed statements in the Article that she had

left urine-soaked bedding and floorboards. Plaintiff even offered to have her DNA tested to disprove them, if Jamie Carano would, but the offer was declined.

72.  Plaintiff denied statements that her Employer feared child abduction or that Plaintiff engaged in extortion.

73. In sum, the Article omitted exculpatory materials, misrepresented and fabricated events, and contains numerous lies intended to destroy Plaintiff's reputation.

74.  The Article contains many more defamatory statements which were made notwithstanding Plaintiff's vigorous efforts to demonstrate them to Defendant Bansinath.

75.  The many false, malicious and defamatory statements in the Article have caused damage to Plaintiff's reputation and business relationships, made her unmarketable as a chef and live-in nanny, employment which regularly can earn her more than $200,000 annually.

**FIRST CAUSE OF ACTION**
**(Defamation *Per Se*)**

76.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 75, as if fully set forth herein.

77.  Defendants wrote and published false statements about Plaintiff, including but not limited to referring to Plaintiff as "The Nanny Squatter," stating or implying that Plaintiff refused to leave the premises, alleging that Plaintiff engaged in criminal or dishonest conduct such as being a "professional con-artist," having a "well-documented history of ingratiating herself with well-off individuals, unlawfully occupying their property in bad faith, and then refusing to leave and abusing the protections afforded by eviction laws"; asserting that Plaintiff damaged property, engaged in extortive practices, abused animals, and posed a danger to children

78. Defendants published these statements to third parties through the Article in The Cut, a widely distributed media outlet, without privilege or authorization.

79. Defendants acted at least negligently, and Plaintiff alleges with actual malice, in that they wrote and published the statements with knowledge of their falsity or with reckless disregard for the truth, despite being provided with evidence disproving the statements.

80. The statements constitute defamation *per se* because they charge Plaintiff with serious crimes, tend to injure Plaintiff in her trade, business, or profession, and otherwise expose Plaintiff to public contempt, hatred, ridicule, aversion, or disgrace.

81. By reason of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
### (Defamation *Per Quod*)

82. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 81 if fully set forth herein.

83. Defendants made and published false statements of fact concerning Plaintiff, including but not limited to statements and implications regarding Plaintiff's alleged misconduct, criminality, and unfitness for her profession.

84. Defendants published these statements to third parties, including specific clients and members of Plaintiff's professional and personal community, as well as the general public, through The Cut Article and related communications.

85. Defendants acted at least negligently, and Plaintiff alleges with actual malice, in that they wrote and published the statements with knowledge of their falsity or with reckless disregard for the truth, despite being provided with substantial evidence disproving the statements.

86.  As a direct result of the Article, and of Defendants' further conduct in circulating it to Plaintiff's associates, Plaintiff suffered special damages. Those special damages include  the loss of specific clients and business opportunities, such as the loss of a private chef client, the inability to open a sleep-aid business called The Snooze Lab, private employment at salaries exceeding $200,000/yr., and reputational harm resulting in pecuniary loss.

87.  By reason of the foregoing, Plaintiff demands damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs.

### THIRD CAUSE OF ACTION
### (Defamation by Implication)

88.  Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 81, 86 and 87 as if fully set forth herein.

89.   Defendants published statements in the Article that, when taken as a whole, can reasonably be read to impart false and defamatory inferences about Plaintiff, including but not limited to the implication that Plaintiff is a squatter, a con-artist, a danger to children, and a person with a criminal or dangerous history, despite Defendants' knowledge of facts to the contrary.

90.  Defendants made and published false statements of fact concerning Plaintiff, including but not limited to statements and implications regarding Plaintiff's alleged misconduct, criminality, and unfitness for her profession, which require extrinsic facts to establish their defamatory meaning

91.  Defendants published these statements and implications to third parties, including the general public and specific individuals in Plaintiff's professional and personal circles, through The Cut Article and related communications.

92.  Defendants acted at least negligently, and Plaintiff alleges with actual malice,  in that they wrote and published the statements with knowledge of their falsity or with reckless disregard for the truth, despite being provided with evidence refuting the negative inferences.

93.  The language of the Article as a whole affirmatively suggests that Defendants intended or endorsed the defamatory inferences, as evidenced by the deliberate omission of exculpatory facts, selective presentation of information, and coordination of publication to maximize reputational harm.

94.  By reason of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Barbara Molnar demands judgment against Defendants  Vox Media, LLC and Bindu Bansinath jointly and severally, as follows:

(a) On the First Cause of Action, compensatory damages for libel *per se*, in an amount to be determined by the jury and the Court, but no less than Five Hundred Thousand Dollars ($500,000.00);

(b) On the Second Cause of Action, compensatory damages for libel *per quod*, in an amount to be determined by the jury and the Court, but no less than Five Hundred Thousand Dollars ($500,000.00);

(c) On the Third Cause of Action, compensatory damages for libel by implication, in an amount to be determined by the jury and the Court, but no less than Five Hundred Thousand Dollars ($500,000.00);

(d) Punitive damages in an amount to be determined by the jury at trial, sufficient to punish Defendants for their malicious and wanton conduct and to deter similar conduct in the future;

(e) A judgment declaring that Defendants published false and defamatory statements and implications concerning Plaintiff, as set forth in the Complaint, and that such statements and implications constitute defamation under New York law.

(f)  A permanent injunction directing Defendants to remove and cease from publishing the Article or any portions thereof in websites, social media accounts and all other platforms under Defendants' control;

(g)  Attorneys' fees and costs of suit to the extent permitted by applicable law or equity; and

(h)  Such other and further relief as this Court deems just, equitable, and proper.

Dated: New York, New York
       July 8, 2026

LAW OFFICE OF RICHARD A. ALTMAN
Attorneys for Plaintiff Barbara Molnar
150 East 56th Street, Suite 12B
New York, NY 10022
212.633.0123
altmanlaw@earthlink.net
www.altmanlaw.nyc